

RECEIVED
MAR 1 0 2023
CHAMBERS OF
JUDGE LAMBERTH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No: 22-CR-45-RCL |
| | : | |
| v. | : | |
| | : | 40 U.S.C. § 5104(e)(2)(G) |
| KENNETH ARMSTRONG III, | : | |
| | : | |
| Defendant. | : | |
| | : | |

*Let this be filed.*
*Royce C. Lamberth*
*U.S.D.J. 3/10/23*

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and Defendant, Kenneth Armstrong III, with the concurrence of his attorney, agree and stipulate to the below factual basis for Defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1.     The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3.     On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United

States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no member of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of approximately $2,734,783.14 million dollars for repairs.

7.     Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Kenneth Armstrong III's Participation in the January 6, 2021, Capitol Riot*

8.     Defendant traveled from Pescadero, California to Washington, D.C. to attend the rally for former President Donald Trump.

9.     After the rally, Defendant joined the crowd and marched to the U.S. Capitol.

10.    While outside on the Capitol grounds, Defendant walked past bike rack fencing that had been pushed aside and green plastic fencing that had been knocked down and rolled up.

11.    As Armstrong approached the Capitol building, he heard flash bang grenades go off and saw smoke near the entrance of the Capitol. He witnessed rioters climbing scaffolding while carrying flags. He saw one rioter climb the scaffolding and use his flag pole to break a window of the Capitol building. Armstrong watched as Capitol Police officers in riot gear cleared rioters off the area near the scaffolding.

12.     Armstrong then moved closer to the Capitol building. As he did, he saw Capitol Police officers inside the Senate Wing Door dressed in riot gear. He noticed rioters climbing in and out of a smashed window on one side, and saw another broken window on the other side of the door.

13.     At about 3:10 p.m., Armstrong proceeded to enter the U.S. Capitol Building through the Senate Wing Doors. He made his way toward the Crypt and took numerous photographs and videos of other rioters and law enforcement officer. Armstrong remained inside the U.S. Capitol Building for approximately 13 minutes. Later in the evening, Armstrong posted on Facebook, "What an amazing day."

14.     After January 6, 2021, Defendant made statements on Facebook about his experience at the Capitol. He stated that he went to the Capitol on January 6 because the vote "was not certified at that point." He also posted: "Yeah I was near the spot where they first got in. They were firing rubber bullets at the first people who came in. Then there were too many and they stood down."

15.     Defendant knew at the time he entered the U.S. Capitol Building that he did not have permission to enter the building and Defendant paraded, demonstrated, or picketed within the U.S. Capitol building.

                          Respectfully submitted,

                          MATTHEW M. GRAVES
                          United States Attorney
                          D.C. Bar No. 481052

By:     */s/ Ashley Akers*
        ASHLEY AKERS
        Trial Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I, **Kenneth Armstrong III**, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 3/9/23

_____
KENNETH ARMSTRONG III
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 3/9/23

_____
DAVID W. RIZK
Attorney for Defendant