UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 22-cr-45 (RCL) |
| v. : | |
| : | |
| KENNETH ARMSTRONG, : | |
| : | |
| Defendant : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Kenneth Armstrong to 14 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

I.  **Introduction**

Kenneth Armstrong, a 53-year-old aquaponics farmer from Northern California, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, ECF No. 32 at ¶ 6, reflects a sum of more than $2.7 million dollars for repairs, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20, as reflected in Armstrong's plea agreement. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Armstrong pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 14 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution is appropriate in this case because Armstrong: (1) traveled to Washington, D.C. and joined a mob whose purpose was to halt the certification of the presidential election because it "was not certified"; (2) entered the Capitol building despite seeing overthrown fencing, hearing flash bang grenades, and watching overwhelmed police officers attempt to disperse rioters with rubber bullets; (3) boasted on Facebook that he had entered the Capitol building and took a "tour of Our House"; and (4) continues to demonstrate no acceptance of responsibility or remorse for his actions, and instead casts blame for the breach on law enforcement.

The Court must also consider that Armstrong's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.

**II.     Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 32 (Statement of Offense), at 1-3.

*Defendant Armstrong's Role in the January 6, 2021 Attack on the Capitol*

Armstrong traveled to Washington, D.C. from Pescadero, California to attend the former president's "Stop the Steal" rally. Before he arrived at the rally, Armstrong posted on Facebook, "About to head into DC for the rally and march. Secret Service has estimated between 2-4M people will be there today."

After attending the rally, Armstrong joined the crowd and marched to the U.S. Capitol. As he approached the Capitol grounds on the West front, Armstrong walked past bike rack fencing that had been pushed aside and green plastic fencing that had been knocked down. When Armstrong neared the Capitol building, he heard flash bang grenades ignite and saw smoke near the entrance to the building. He witnessed rioters climbing scaffolding while carrying flags. Armstrong saw one rioter climb scaffolding and use his flagpole to break a window of the Capitol building. Armstrong also watched as police officers in riot gear cleared rioters from the area near the scaffolding.

Armstrong worked his way up to the Capitol building. As he did, he saw police officers inside the Senate Wing Door dressed in riot gear. He noticed rioters climbing in and out of a smashed window on one side, and saw a broken window on the other side of the door. As he approached the door, deafening sirens blared from the building.

Despite seeing all of the warning signs that he shouldn't enter, Armstrong walked through the Senate Wing Doors at approximately 3:10 p.m. He was wearing a black jacket and, at times, a white and grey winter hat.



*Figure 1: Screenshot of CCTV footage at the Senate Wing Door, showing Armstrong inside the Capitol building taking a video or photo.*

Seconds after Armstrong entered the Capitol building, he turned to video record a line of police officers in riot gear. Rioters began chanting "USA! USA!" as they made their way deeper into the Capitol building. Armstrong continued into the Capitol and made his way into the Crypt.



*Figures 2 & 3: Screenshot of CCTV footage, left, and open-source footage, right, showing Armstrong walking through Crypt*

Armstrong roamed around the Crypt, taking in the chaos of the area. Eventually, Armstrong left the Crypt and exited out of the same door that he entered. In total, Armstrong remained inside the Capitol for about 13 minutes.

After he left, Armstrong posted on Facebook about his breach of the Capitol. On January 6, 2021, he posted, "What an amazing day" and "Had a great time." He bragged about making it inside the Capitol building, posting "Got inside and took a tour of Our House." Armstrong described the chaos of the breach, posting "Yeah I was near the spot where they first got in. They were firing rubber bullets at the first people who came in. Then there were too many and they stood down." Armstrong also posted that when he "was walking out of the Capitol a guy next to me was saying that they got into one of the offices and sparked a joint. Lol."

On January 7, 2021, Armstrong posted on Facebook his concerns about the recent election, citing "massive and blatant" election fraud and referencing fraud from "dominion voting machine[s]" in Georgia. On January 8, 2021, Armstrong posted on Facebook that he went to the

Capitol on January 6 because the vote "was not certified at that point" and acknowledged that "things c[ould] change in the next two weeks."

At no time did Armstrong accept responsibility for his role or participation in the mob that overtook the Capitol. Instead, he made posts like, "Why did the most heavily guarded 2 square miles in the country allow this to happen. Almost as if it was planned. . . ." Months after January 6, Armstrong claimed that the media crafted a "narrative" about January 6 and that it was a peaceful occurrence – with the single exception that a rioter was shot.

When the FBI arrested Armstrong, he yelled "Let's go Brandon!"[2] as he was placed in the back of the vehicle, and he told agents that his arrest was going to be a "huge PR problem" for them.

*Armstrong's Interview with the FBI*

The FBI interviewed Armstrong on March 12, 2021. During the interview, Armstrong admitted to his conduct on January 6. Armstrong explained that, as he arrived on Capitol grounds, there was a lack of security presence around the Capitol. He explained that he was concerned and shocked that people could be as close as they were to the Capitol building. Armstrong admitted to hearing sounds like flash bangs and seeing smoke near the entrance of the Capitol, and that he watched people climbed up the construction scaffolding and saw one rioter use the end of a flagpole to break a window of the Capitol building.

When Armstrong entered the Capitol building, he saw police officers in riot gear. Armstrong explained that he eventually left the building because he did not want to get arrested.

Armstrong maintained that the day of January 6 was a "surreal" experience, but it was not a violent insurrection. Armstrong acknowledged that January 6 was a dark day as a whole, and

---

[2] "Let's go Brandon" is an expression used as a substitute for the phrase "Fuck Joe Biden."

said that blame should be placed on the people who committed acts of violence and on the government for not protecting property.

*The Charges and Plea Agreement*

On January 18, 2022, the United States charged Armstrong by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On April 20, 2023, pursuant to a plea agreement, Armstrong pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. Armstrong admitted that he knew he did not have permission to enter the Capitol building and that he paraded, demonstrated, or picketed within the U.S. Capitol building. By plea agreement, Armstrong agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Armstrong now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Armstrong faces up to six months of imprisonment and a fine of up to $5,000. Armstrong must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 571 F. Supp. 3d 1, 8 (D.D.C. 2021). While Armstrong's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Armstrong, the absence of violent or destructive acts is not a mitigating factor. Had Armstrong engaged in such conduct, he would have faced additional criminal charges.

In this case, the purpose of Armstrong's presence in the Capitol was notable. As he said on Facebook, he was there because the election was not certified at that point, and he knowingly joined a mob that succeeded in temporarily halting the certification. Armstrong entered the Capitol, with a larger crowd, through a damaged door at a time that was rife with commotion, including a blaring alarm and rioters climbing through broken windows to the side of the door. Almost immediately when Armstrong walked inside the building, he used his cell phone to record a line of police officers standing guard in riot gear. All signs demonstrated that he should not have been there.

Afterward, on Facebook, Armstrong maintained the narrative that January 6 was a peaceful day at the Capitol and placed the blame on officers – stating that the Capitol building should have been better protected. Armstrong's inability to accept his role in the riot is a significant aggravating factor. During his arrest, Armstrong continued to not grasp the gravity of his situation, stating that his arrest would be a "huge PR problem" not for himself but for the FBI.

B.  **The History and Characteristics of Armstrong**

As set forth in the Presentence Investigation Report, Armstrong's criminal history is limited to one conviction of "Use/Under the Influence of a Controlled Substance" from 1999. ECF No. 34 at ¶ 36. Armstrong has been compliant with his pre-trial conditions of release and cooperative with law enforcement at the time of and since his arrest.

C.  **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

D.  **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important

8

consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence:* Armstrong's actions and his social media posts after January 6 show a troubling lack of understanding regarding the seriousness of the breach of the Capitol, and highlight the need for specific deterrence. Armstrong knew that his entry was unlawful, and it was evident to him and anyone else at the Capitol that the situation outside and inside the building had devolved into a riot. Armstrong discussed seeing police officers use rubber bullets and teargas to disperse rioters, but he went inside the building anyway. And even despite seeing these and other signs, and participating in the mob attack on the Capitol, Armstrong shifted blame after January 6, contending that the riot was allowed to happen, "[a]lmost as if it was planned." As of the date of

this filing, Armstrong has not expressed remorse for his unlawful conduct on January 6. Armstrong must learn that joining a mob and storming the U.S. Capitol is not appropriate recourse to protest his concerns about supposed voting irregularities and the outcome of a presidential election. The need for specific deterrence in this case supports the Government's recommendation of 14 days of incarceration.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Armstrong based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Armstrong has pleaded guilty to Count Four of the Information, charging him with violating 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

11

...

...

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For

that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Janet West Buhler*, 21-cr-510 (CKK), the defendant entered and remained in a sensitive area of the Capitol, cheered as rioters physically assaulted U.S. Capitol Police officers at the East Rotunda doors, and, similar to Armstrong, ignored several red flags upon approaching and entering the Capitol Building, including the sounds of flashbangs being

13

detonated, plumes of smoke clouding the air, rioters tearing down tarp covering the northwest staircase of the Capitol Building, and shattered glass that was the result of rioters breaching the Senate Wing Doors. Buhler did enter the Senate Gallery, a highly sensitive space, which merited a slightly higher sentence in that case. The court sentenced Buhler to 30 days' incarceration followed by 36 months' probation.

In *United States v. Brandon and Stephanie Miller*, 21-cr-266 (TSC), the defendants entered the U.S. Capitol through a broken window by the Senate Wing door 45 minutes after the first breach. Like Armstrong, the Millers made videos and posted on Facebook, expressing pride about taking part in the breach. Like Armstrong, the Millers did not express remorse or take responsibility for their actions. The court sentenced Brandon and Stephanie Miller to 14 days of incarceration followed by 36 months of probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Armstrong must pay $500 in restitution, which reflects in part the role he played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.*  Armstrong's restitution payment must be made to the Clerk of

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* ECF No. 34, PSR ¶ 94.

### VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Armstrong 14 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Armstrong's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   s/ *Ashley Akers*
Trial Attorney
MO Bar No. 69601
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov

## **CERTIFICATE OF SERVICE**

On this 6th day of June 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

s/ *Ashley Akers*
Ashley Akers
Trial Attorney
