JODI LINKER
Federal Public Defender
Northern District of California
DAVID W. RIZK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:         David_Rizk@fd.org

Counsel for Defendant ARMSTRONG

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:**  1:22-CR-00045 RCL |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| KENNETH ARMSTRONG III, | |
| Defendant. | |

## I.    INTRODUCTION

Defendant Kenneth Armstrong III will be before the Court for sentencing in this January 6 misdemeanor matter. Mr. Armstrong made a serious error when he joined the crowd near the White House and walked for 45 minutes to Capitol Hill. There, he saw other members of the crowd climbing scaffolding around the Capitol building. He watched police clear a walled area and backed away as they approached and moved people away. He was not present for the breach of the building and was not present for any violence between members of the crowd and law enforcement.[1] He did

---

[1] The government's sentencing memorandum inaccurately states that he was "watching overwhelmed police officers attempt to disperse rioters with rubber bullets," Gov't Memo. (Dkt No. 39) at 2, but that is not supported by the PSR or the evidence in the case. The evidence is that Mr. Armstrong later posted on social media that police "were firing rubber bullets at the first people who came in"—

1  not personally partake in any violent or threatening behavior. He also did not personally destroy or

2  deface any government property. The videos he took on his cell phone reveal he was polite to those

3  around him in the crowds that milled around roughly an hour after the first individuals broke into the

4  Capitol building itself. For about 15 to 20 minutes, he stood outside and watched as hundreds of

5  people walked in and out of the building through an open door into the Capitol. At about 3:10 p.m.—

6  approximately an hour after the breach—he followed others into the building. In the building, he

7  walked down some hallways to the Crypt, took more photographs and videos, and then left without

8  entering any sensitive areas or have any significant interactions with anyone.

9     He posted on social media that it had been "amazing day," but also described the Capitol police

10  as "nice" and "helpful." Obviously, he did not immediately appreciate the serious wrongfulness of

11  what had transpired. However, when FBI agents received a tip that he had been present and paid him

12  a visit, his view had changed and he described January 6 as a "dark day." He voluntarily participated

13  in an interview with visiting agents on March 11, 2021. During the interview, he truthfully answered

14  their questions about January 6, drew up a map of where he had been that day, shared photographs

15  and videos taken on his phone, and told agents that he had not witnessed firsthand violence but

16  condemned the violence as "bad." When the agents requested a copy of one of the videos he had

17  taken, he sent it and told the agents, "Glad I could be of assistance."

18     Mr. Armstrong has no significant criminal history and no history of violence or other

19  concerning risk factors. He is a vegetable farmer in Half Moon Bay, California; his small farm

20  supplies local restaurants. Although he has no family of his own, he maintains a supportive, close

21  relationship with the daughter of his former partner. His net worth is estimated to be approximately

22  $70,000. He has made payments of $3,500 in contributions already for representation from the

23  Federal Public Defender's Office. His farm has lost substantial amounts of business as a result of his

24  participation in January 6 (which has been reported in the local news media).

25     Mr. Armstrong respectfully requests a sentence of 36 months of probation and $500 in

26

27  which was based on what he had seen on television after the fact. All of the video and documentary

28  and location evidence supports the conclusion that Mr. Armstrong was a full hour behind the violent
    parts of the crowd and never present at any location at a time where there was violence between the
    crowd and law enforcement.

DEFENDANT'S SENTENCING MEMORANDUM
*ARMSTRONG*, CR 1:22–00045 RCL

1   restitution, which is in line with sentences this Court has handed down in comparable matters such as

2   *United States v. Morgan-Lloyd*, No. 21-CR-164 RCL, *United States v. Uptmore*, No. 21-CR-149

3   RCL, and *United States v. McAuliffe*, No. 21-CR-608 RCL. If the Court were to believe some

4   additional sanction is merited, Mr. Armstrong respectfully requests 14 days of home detention, which

5   will permit him to continue working and paying his two employees without a disruption that would

6   likely shutter his small business.

7   **II.    BACKGROUND**

8          Mr. Armstrong comes from a middle-class family in Northern California. He has spent the vast

9   majority of his life in and around the Bay Area. He described a normal upbringing by two parents

10  who were travel documentarians to the assigned probation officer. PSR ¶ 44. He enjoyed close

11  relationships with his parents until they passed, and with his two adult brothers. *Id.* He graduated high

12  school in 1988 at San Mateo High School and graduated from the University of Colorado at Boulder

13  with a B.A. in 1992. *Id.* at ¶¶ 59-60. After school, he spent a few years travelling and then taught

14  English as a foreign language in Ecuador for two years. *Id.* ¶¶ 46, 61.

15         Mr. Armstrong has never been married but maintains a supportive relationship with his former

16  partner Jessica Patton, who has submitted a letter to the Court. Rizk Decl., Ex. A. Mr. Armstrong has

17  also continued to be present and supportive as a stepfather-figure to Ms. Patton's daughter, who

18  attends high school. PSR ¶ 45. A lifelong friend of Mr. Armstrong's, Charlie Harris, writes to the

19  Court to describe him as a peaceful and generous person who spends time on the weekends hiking

20  and volunteers from time to time for the state parks. Rizk Decl., Ex. B.

21         Just over 10 years ago, he founded a vegetable farm in Half Moon Bay, California, near where

22  he lives. The farming operation is modest and loses money but provides valuable services to the

23  community. It sells greens (lettuce, basil, peppers, herbs) directly to local restaurants, which is the

24  majority of his business, as well as individual drop-in customers at a farm stand, and runs educational

25  tours for local schools. *Id.* ¶ 64. He employs a couple of employees and has personally invested most

26  of his personal life savings into the farm even though it is losing money. *Id.* ¶¶ 64, 77. Mr. Armstrong

27  himself does not earn a salary and never has from the farm; rather, it is a labor of love. *Id.* ¶ 45.

28         Mr. Armstrong's participation in the events in January 6 is accurately reflected in his plea

agreement and the PSR, both of which reflect information that he voluntarily admitted to FBI agents when they visited him. The following are summary excerpts verbatim from the FBI's report of interview (Bates 2660-SF-3409172 Serial 3) of the FBI's meeting with Mr. Armstrong on March 11, 2021:

- After being advised of the identities of the interviewing Agents, Special Agent (SA) Laura Luppens and SA Desireé Gorham, and the nature of the interview, ARMSTRONG invited the interviewing Agents to sit with him inside his office at the farm, and provided the following information:
- ARMSTRONG attended the Trump rally and speech in DC at approximately 10:30am EST on January 6, 2021. After the conclusion of the speech and rally, at approximately 1:15pm EST, ARMSTRONG walked with the crowd to the United States Capitol Building (CAPITOL). It took approximately 45 minutes to walk to the CAPITOL.
- ARMSTRONG stood at the back of a crowd of other people close to the wall on the left side at the base of the steps where the inauguration would occur. At approximately 2:00pm EST, he heard something like flash bangs and saw smoke near the entrance of the CAPITOL, outside the building, and assumed it was from the Capitol Police, although he did not know for sure because he did not see the source of the noise and smoke.
- ARMSTRONG then walked around the CAPITOL, headed in in the direction he thought was north, and walked up a platform ramp towards some scaffolding. ARMSTRONG saw multiple people up on the scaffolding carrying flags.
- ARMSTRONG saw one unknown individual climb the scaffolding and use the end of a flag pole to start breaking a window on the CAPITOL. ARMSTRONG and others yelled at the unknown individual to stop breaking the window, and the unknown individual complied and came down the scaffolding.
- *[Agent Note: At this point in the interview, ARMSTRONG began drawing a map of the CAPITOL building with a pen on a piece of paper from his desk, in order to show the interviewing Agents the locations he was describing....]*

Rizk Decl. ¶ __. The drawing Mr. Armstrong helpfully provided to the agents when he was interviewed is attached hereto as an exhibit. *Id.*, Ex. C. The FBI memorandum of Mr. Armstrong's voluntary interview goes on:

- Eventually the Capitol Police showed up in riot gear, and cleared all of the people off of the bleachers near the scaffolding where the people holding flags had been.
- While standing outside the CAPITOL, ARMSTRONG observed hundreds of people walking in and out of a door that led inside the CAPITOL building. ARMSTRONG eventually walked up close to the building and stood outside this door for a while, watching people go in and out. ARMSTRONG could see a few Capitol Police officers inside the door.
- ARMSTRONG noticed one broken window to the right of the open door people were going in and out of, and another broken window on a different wall to the left side of the open door, at a right angle to the wall where the door was.
- After watching people walk in and out of the CAPITOL building for awhile, ARMSTRONG entered through the open door into the CAPITOL. He described the moment as surreal. ARMSTRONG had no intention to, nor did he, touch, damage, graffiti,

or steal anything inside.

- ARMSTRONG stayed inside the CAPITOL for approximately 5-15 minutes, and then left, because he didn't want to get arrested, he just wanted to watch what was happening.
- ARMSTRONG did not witness any violence at the CAPITOL, but of course the violence that did happen that day was bad. The blame for that should be on the people who committed those acts of violence as well as on the government for not protecting their property and not preparing adequately. Overall it was a "dark day for the country as a whole."
- ARMSTRONG did take some photographs and video while he was inside the CAPITOL building.
- *[Agent Note: At this point in the interview, the interviewing Agents asked ARMSTRONG if they could see the photographs and videos that ARMSTRONG took inside the CAPITOL. ARMSTRONG agreed, and located some of these photos and video on his cell phone....]*
- ARMSTRONG was open to being re-contacted by the interviewing Agents with any follow-up questions, and provided his cell phone number: [omitted]. ARMSTRONG told SA Luppens that he would try to send her the video again later that day, and that if she did not receive it, she should text him on his cell phone to follow-up.

Rizk Decl. ¶ 5. When FBI Special Agent Luppens later texted Mr. Armstrong requesting a copy of the video, he sent it to her, and when she thanked him, he politely responded, "You're welcome. Glad I could be of assistance." *Id.*, Ex. D.

Mr. Armstrong was charged with four misdemeanors by complaint on January 18, 2022. He was arrested on January 20, 2022 and released from jail the following day by the magistrate court. Unsurprisingly, Mr. Armstrong has been perfectly compliant with the pretrial conditions of release imposed on him for the last year and a quarter. He pled guilty pursuant to a plea agreement with the government on April 20, 2023.

### III.   PRESENTENCE REPORT

Mr. Armstrong respectfully objects to just three aspects of the PSR: (1) probation's recommendation that he pay a $5,000 fine, (2) the suggestion that he should be dispossessed of two firearms in a storage facility away from his home during the pendency of his supervision, and (3) drug testing, which is unnecessary.

As to the fine, of course the Court possesses significant discretion to impose one or waive it. *See* 18 U.S.C. § 3571(a) ("A defendant who has been found guilty of an offense *may* be sentenced to pay a fine." (emphasis added)). Mr. Armstrong voluntarily provided full financial disclosures to U.S. Probation. *Id.* ¶ 68. There is no dispute that Mr. Armstrong is indigent, carries substantial personal credit card and business debt (reflected in the PSR as a "personal loan," has a net worth of

1 approximately $70,000, and continues to invest the last of his dwindling life savings to pay two

2 employees working for his small working farm while he himself draws no salary or profit. *Id.* ¶ 69.

3 Notably, the Court has already found that it is unnecessary for Mr. Armstrong to continue making

4 contribution payments past the $3,500 he has already paid for representation by the Federal Public

5 Defender's Office. A fine of $5,000 for a misdemeanor conviction would be devastating and

6 excessive, constituting over 7% of his total net worth. Looked at from another perspective, it is over

7 three times his monthly rent. Imposition of the fine would mean he will likely have to lay off his two

8 employees imminently, as the farm has already suffered major year-over-year due to the COVID-19

9 pandemic's impact on restaurants and negative publicity in the local press generated by Mr.

10 Armstrong's presence at the Capitol on January 6. He has thus been amply punished from a financial

11 perspective, and the imposition of such a substantial, punitive fine is likely to be counterproductive

12 from a rehabilitation perspective, given that it will jeopardize his near-term housing and occupation.

13 U.S. Probation, for its part, acknowledges all of the relevant facts—including that Mr. Armstrong is

14 in near dire-straits financially and lacks an income—but fails to offer any specific reason why a

15 $5,000 fine is inappropriate. Instead, probation just flatly claims that "the defendant has not

16 established an inability to pay a fine in this case given his net worth," and cites the U.S. Sentencing

17 Guidelines § 5E1.2(a)—which do not even apply to this Class B Misdemeanor case.

18          As to the two firearms, Mr. Armstrong is not a prohibited person of any kind[2] and enjoys his

19 constitutional right to possess the guns legally. He has no history of weapons-related convictions or

20 arrests, and no history of violence of any kind. There is no allegation in this case that Mr. Armstrong

21 was violent or made any threats on January 6. During the past year and a half while this case was

22 pending, the two rifles have been stored in a locked storage unit which is located in a different city

23 from Mr. Armstrong's residence. When Mr. Armstrong was released on bond, the magistrate court

24 found that this arrangement was sufficient to ensure the safety of supervising U.S. Pretrial Services

25 Officers, and of course there have been no safety issues whatsoever with Mr. Armstrong. He has been

26

27 [2] U.S. Probation appears to be mistaken about this fact, because the probation officer's
recommendation to the Court contains the following inapplicable, boilerplate suggestion: "…the
28 probation officer will consult the Court for direction on the appropriate equitable disposition when
the defendant is legally, permanently prohibited from possessing the items. PSR, Addendum at 2.

1    completely compliant with every condition of release imposed upon him.

2         Finally, as to drug testing, the law provides that it may be suspended if there is reliable

3    information that there is a low risk of any future substance abuse by the defendant. Here, there is no

4    **IV.   LEGAL STANDARD**

5         A sentencing court's "overarching duty" is to "impose a sentence sufficient, but not greater

6    than necessary, to comply with the sentencing purpose set forth in § 3553(a)(2)." *Pepper v. United*

7    *States*, 562 U.S. 476, 491 (2011). Those goals include the need to: (1) reflect the seriousness of the

8    offense, promote respect for the law, and provide just punishment for the offense; (2) afford adequate

9    deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4)

10   provide the defendant with needed educational or vocational training, medical care, or other

11   correctional treatment in the most effective manner. See 18 U.S.C. § 3553(a)(2). Section 3553(a) also

12   directs the Court to consider additional factors, including: the nature and circumstances of the

13   offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of

14   sentences available, § 3553(a)(3); the need to avoid unwarranted sentencing disparities, § 3553(a)(6);

15   and the need to provide restitution to any victims of the offense, § 3553(a)(7). Because this case only

16   involves a Class B Misdemeanor, petty offense, the United States Sentencing Guidelines do not

17   apply. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

18   **V.   ARGUMENT**

19        Several matters warrant the Court's consideration in connection with Mr. Armstrong's request

20   for a sentence of three years of probation:

21        *First*, the nature and circumstances of the offense and the history and characteristics of the

22   defendant do not warrant a custodial sentence here. Thus, while the defense certainly recognizes the

23   severe harm that was done on January 6 and the need to continue to sanction those responsible, Mr.

24   Armstrong is among those least culpable who were present and participated in the trespass on the

25   Capitol grounds. As set forth below in further detail, he should be sentenced in line with those who

26   are similarly culpable. By way of brief example here, the government recommended 36 months of

27   probation in *United States v. Anna Morgan-Lloyd*, No. 21-CR-164 RCL, because according to the

28   government's sentencing memorandum she:

1    (1) did not engage in any preplanning or coordination prior to her entry into the Capitol; (2)

2    did not personally engage in acts of violence or destruction of property, or incite the same; (3)

3    only remained in the Capitol for a brief period of time and in a limited area of the building; (4)

4    cooperated with law enforcement at the time of arrest, including submitting to a voluntary

5    interview and search of her cell phone; (5) timely admitted to her actions and accepted

6    responsibility; (6) expressed contrition; and (7) does not have a criminal history.

7    *United States v. Morgan-Lloyd*, No. 21-CR-164 RCL, Dkt No. 22 at 1-2. The same is true of Mr.

8    Armstrong. The government's memorandum in Ms. Morgan-Lloyd's case goes on to further justify

9    its non-custodial sentencing recommendation by noting that, "the Government is not aware of any

10   evidence that Defendant's entry into the Capitol was preplanned or coordinated with anyone else,

11   including any extremist or organized groups," "the Government is not aware of any evidence that the

12   Defendant incited others to commit acts of violence or destruction,"[3] "the Government is not aware

13   of any evidence that the Defendant engaged in any violence towards law enforcement," "the

14   Government is not aware of any evidence that the Defendant destroyed or stole any property from

15   the Capitol," "based on the Government's investigation, it appears that the Defendant remained in a

16   limited part of the Capitol building for a limited period of time – i.e., in one hallway for a little over

17   ten minutes," and "[t]he Government is not aware of any evidence that the Defendant entered any

18   rooms or offices in the Capitol, the Capitol Rotunda, or the Senate or House Chamber." *Id.* at 6.

19   Again, the same is true of Mr. Armstrong. Thus, however one looks at his involvement, none of the

20   aggravating factors that may apply in other cases are present here.

21        The government also completely overlooks the value of Mr. Armstrong's change in

22   perspective. Even before this case was initiated and just like Ms. Morgan-Lloyd, Mr. Armstrong

23

24   ───────────────

25   [3] In this case, the government argues that "for a misdemeanor defendant like Armstrong, the absence
     of violent or destructive acts is not a mitigating factor." Gov't Memo. (Dkt No. 39) at 7. Of course,

26   that position is directly at odds with its position in Ms. Morgan-Lloyd's case as well as dozens of
     other January 6 cases, and ultimately makes no sense. Of course, the absence of any destructive or

27   violent behavior by Mr. Armstrong is a mitigating fact that is directly relevant to sentencing under 18
     U.S.C. § 3553(a)(1). The government's charging decisions cannot abrogate the express terms and

28   commands of the sentencing statute.

voluntarily chose to cooperate with the government and sat down for an interview. During the interview, Mr. Armstrong recognized that January 6 was a "dark day," and condemned the violence that occurred. Unlike the vast majority of defendants, Mr. Armstrong was *extremely* forthcoming about his conduct: he was indisputably truthful in answering the agents' questions, he even drew a picture to assist the agents in their investigation, shared content from his cell phone, and politely sent agents an incriminating video showing that he was present. These are not the words or actions of someone who is refusing to take responsibility or flouting the law. The Court credit Mr. Armstrong's post-rehabilitation expressions of remorse. *Pepper*, 562 U.S. at 491 ("Postsentencing rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a)…").

The government's argument for a custodial sentence, however, does not fully acknowledge either admission from Mr. Armstrong, and instead focuses on much older statements on social media that no longer reflect his views. Similarly, the government's treatment of Mr. Armstrong's history and characteristics overlooks virtually everything in the PSR—except a 20 year-old marijuana conviction that ended in a *successful* pretrial diversion, which the government also overlooks to mention. Thus, the government's custody request simply does not take into account any of the positive or mitigating facts concerning Mr. Armstrong, including: his lack of any serious criminal history, his high school and college education, his strong family and community ties, his productive record of employment. Instead, the government seems to suggest that most misdemeanor January 6 cases deserve a sentence of custody, regardless of any individualized factors. In support of that point, the government quotes with approval Judge Hogan's comments in *United States v. Bustle, et al.*, No. 21-CR-238-TFH, *see* Gov't Memo. (Dkt No. 39) at 8. However, the government omits to mention that both misdemeanant defendants in *Bustle* were sentenced to a term of probation, not custody.

*Second*, deterrence does not justify a custodial sentence. The defense appreciates that some January 6 cases merit a custodial sentence in the service of general deterrence. This case is not one of them. Those participants in January 6 who were destructive or violent or threatening or inflammatory face a different calculus, but for Mr. Armstrong in particular, it strains credulity to claim that the general public would derive any generally deterrent "message" from his sentence. He is not somebody that is the focus of any significant media attention because he did not play any meaningful

1   role. He was present and entered the Capitol when he knew he should not have done so, but he did

2   not offend the law in any other way.

3          In an effort to bolster its case for deterrence as to Mr. Armstrong specifically, the government

4   unfortunately misrepresents the record as noted above (in footnote 1). It argues: "Armstrong

5   discussed seeing police officers use rubber bullets and teargas to disperse rioters, but he went inside

6   the building anyway." Gov't Memo. (Dkt. No. 39) at 9. In fact, Mr. Armstrong did not witness police

7   "using rubber bullets and teargas to disperse rioters." Rather, he posted to social media—based on

8   television coverage he saw later in the day—that he had entered the building in the same location

9   where the initial breach occurred. Per his plea agreement, Mr. Armstrong posted on Facebook that he

10  "was near the spot where they first got in. They were firing rubber bullets at the first people who

11  came in. Then there were too many and they stood down." There is no real dispute that Mr.

12  Armstrong was *not* present for these events and instead was recounting them second-hand. There is

13  *no evidence* whatsoever that Mr. Armstrong was at the Capitol at the time of the breach. Rather, all of

14  the cell phone, video, photographic, and location evidence in the case proves conclusively that he was

15  not present and did not enter the Capitol until approximately an hour after the breach occurred. For

16  what it is worth, Mr. Armstrong also did not mention seeing any such violence when he truthfully

17  admitted all relevant facts to the FBI during his interview. Defense counsel explained this to the

18  assigned Assistant United States Attorney in no uncertain terms when the parties negotiated the plea

19  agreement, but it seems the government has unfortunately persisted in overstating the record to the

20  Court in its effort to put Mr. Armstrong in jail for two weeks. With respect, the Court should not

21  accept the invitation on such false pretenses.

22         *Third*, public safety does not require a custodial sentence in this case. Mr. Armstrong does not

23  present a threat to anyone. His friends and family describe him as a generous and peaceful man, and

24  the record supports that observation. Again: he has no history of violence or threats, none alleged in

25  this case, and there is no indication that he would ever engage in violence of any kind. He also did

26  not participate personally in any destructive conduct. He also did not deface or destroy any

27  government property, despite the opportunity to do so. As he told FBI agents, he had no intention of

28  doing so—and actually urged a fellow protester to stop attempting to break a window. Nevertheless,

he agrees to pay $500 in restitution given the overall harm that occurred on January 6.) Thus, public

safety does not merit a harsher sentence. 18 U.S.C. § 3553(a)(2)(C).

    *Fourth*, and finally, the need to avoid unwarranted sentence disparities counsels against

imposing a custodial sentence. Other, similarly situated defendants before this Court have received

non-custodial sentences:

- In *United States v. Morgan-Lloyd*, No. 21-CR-164 RCL, the facts very closely resembled those presented here (as discussed above), the government recommended a non-custodial sentence, and the Court imposed a sentence of 36 months of probation, 120 hours of community service, and $500 restitution.

- In *United States v. Uptmore*, No. 21-CR-149 RCL, the defendant brought his son to the Capitol, and personally watched police deploying tear gas and members of the crowd using chemical sprays against police, entered the Capitol three minutes after the breach, were present for the deployment of tear gas *inside* the Capitol, took videos of damage and tear gas inside the Capitol, and then lied to the FBI when he was interviewed subsequently; although the government requested a sentence of 21 days of custody, the Court sentenced Mr. Uptmore to 36 months of probation, 21 days of home detention, and $500 restitution.

- In *United States v. McAuliffe*, No. 21-CR-608 RCL, the defendant actually witnessed scenes of significant violence prior to entering the Capitol, entered a hideaway personal office of a Senator, took "trophy" pictures of other protesters doing damage, and whereas the government recommended 14 days of incarceration the Court sentenced Mr. McAuliffe to 36 months of probation, 60 days of home detention, and $500 restitution.

By contrast, in cases where incarceration was imposed, the facts were considerably more aggravated

than those presented in this case:

- In *United States v. Scavo*, No. 21-CR-254 RCL, the defendant was personally present at the initial breach of the Capitol in the crowd at the door and recorded videos of individuals assaulting officers as the crowd pushed past officers into the building; the

government requested 14 days of incarceration, and the Court imposed 60 days of custody, a $5,000 fine, and $500 restitution.

- In *United States v. Lammons*, No. 22-CR-103 RCL, the defendant pushed into the Capitol four minutes after the initial breach, smoked marijuana in the Capitol, joined a crowd chanting and pushing back retreating officers, and disregarded police commands to exit the area; the government recommended 30 days of incarceration and the Court imposed 30 days of incarceration followed by 30 months of supervised release and $500 restitution.

The government's memorandum is unable to cite a single case with comparable facts and a custodial sentence that resulted. Instead, the closest case the government can muster comes from a different Court, in which the defendant said "Fuck ya" in response to police officers in the Capitol, and also called for a "revolution/civil war" on social media. *See United States v. Miller*, 21-CR-266 TSC. Obviously, the government is aware of each and every January 6 case and outcome, and its failure to identify any single case that warranted a jail sentence that resembles Mr. Armstrong's case speaks volumes. To avoid disparate outcomes, Mr. Armstrong therefore respectfully requests a non-custodial sentence.

## VI.   CONCLUSION

For the foregoing reasons, Mr. Armstrong respectfully requests a sentence of three years of probation, no fine, and restitution in the amount of $500.


Dated:     June 6, 2023                                    Respectfully submitted,

                                                           JODI LINKER
                                                           Federal Public Defender
                                                           Northern District of California

                                                                    /S
                                                           DAVID W. RIZK
                                                           Assistant Federal Public Defender